Alexander v. Express Energy Svc Oprt, L.P. May it please the Court, Red King, along with Bernie Strauss and Sarah Luman, for the Plaintiff Appellant Michael Alexander. A plaintiff does not need to be a sailor in order to be a seaman. The cliché of hand, reef, and steer was once and for all put to bed by Wielander. The aiding and navigation requirement has been jettisoned. I'm going to keep the maritime figures of speech to a minimum. You don't have to. You've got all the experts there. Say whatever you want. But I believe that a bias persists, and I think that's part of the root of the decision in the lower court. A bias exists against brown water and oil patch seamen. Is Judge Barbier biased? Oh, I'm not suggesting that Judge Barbier is biased. I think that there's some bias in— What it shows is that on 35 percent of the P&A jobs that Mr. Alexander went on, he had a lift boat that went along with him on the job that assisted in the P&A work. Is that right? That's a fair statement, Your Honor. That's what the defendant concedes. Actually, if the math is done appropriately, and this is part of the record, they miscalculated, and it's actually 37.2 percent. But I'm not going to quibble about the 2.2 percent. Do you have any evidence of how much time he spent actually working onboard the lift boat? Well, we believe that the— No, no, no. I'm asking if you had any evidence showing the amount of time he worked on the lift boat. There is no evidence either by the defendant or by us that would indicate what percentage to a mathematical certainty. His deposition testimony is that the majority of his equipment was on the lift boat and that he operated that equipment from the lift boat. The vessel's crane was essential to doing this work. So the vessel is technically called a lift boat. I would say it's a P&A boat, and he's a P&A hand, and that's how he's contributing to the function of the vessel. Was the crane essential or just helpful? Essential, and that's admitted by the defendant, Ares. I mean, I'm sorry, one of the defendants, Ares, the vessel owner. Deploying the wire line. It would be used essentially as the derrick. So depending on what phase of the operation, Your Honor, it may be deploying the wire line. It may be pulling tubing out of the well, out of the well bore. My client operated this cement mixers, blenders, and pump that was located on the lift boat itself. It would be connected to the well with a hose. Obviously, the cement has to get from the vessel down into the well to complete the P&A. Your case is concerned it's unnecessary for you to show how much time he spent actually working on the boat. Well, we believe that as a matter of law. Roberts v. Cardinal Services says they analyzed, the Fifth Circuit analyzed it as working alongside, and so it didn't seem to be that critical of a fact like did he spend 83 percent of his time on the vessel versus 17 percent on the platform with the vessel alongside. Of course, that is what Express has hung their hat on. Your answer to my question is yes. As far as your case goes, you don't care whether he spent 5 percent of his time on the boat or 30 percent of his time on the boat. It doesn't matter to your case. I think it does matter. It certainly provides a flavor, and I think that we've got evidence that shows that substantial work was performed on the lift boat. But as long as he's working in the service of the ship, not to quote Chandris to the court, but as long as he's working in the service of the vessel, he's eligible for seaman status. So I— So the mission of the vessel, the Ramex, was you're asserting plug-and-a-band operations, not merely transportation or lodging. Absolutely, Your Honor. And in fact, Ares, the vessel owner— What do you want? Admitted that that was the function of the vessel, that it was— The owner of the vessel. I'm sorry? The owner of the vessel. Yes, the owner of the vessel. Let me ask you about this. Chandris really controlled, doesn't it? Isn't that the case? It really controlled? Chandris and I would say Wielander. All right. Wielander's— I want you to listen to this quote and tell me how you'd interpret it. It's talking about the substantial connection requirement, and they say the fundamental purpose of this substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based employees who have only a sporadic connection to a vessel in navigation, and therefore those whose employment does not regularly impose them to the perils of the sea. And then give us this quote from Benedict. Quote, if it can be shown that the employee performed a significant part of his work on board the vessel on which he was injured with at least some degree of regularity and continuity, the test-receivement status will be satisfied. Isn't that the law? I agree with that, Your Honor, and I think what Chandris is trying to protect against is when you have a dead ship or a casino boat or a boat that's always at the dock, but you might have an employee that goes on and off the vessel, they want to make sure the vessel is in navigation. And there's some confusion about that. A vessel in navigation does not mean a vessel underway. So a vessel moored next to a platform is in navigation. Isn't the whole purpose of the in-connection prong of a seaman test to make sure that he has an adequate connection to the vessel? Absolutely. Your Honor, in your opinion of NACAN, said that the 30 percent rule is the very means by which that's determined. And we've got 37.2. We're talking about work on the vessel in NACAN. But if you look at prior precedent, which controls Roberts v. Cardinal Services, the whole analysis there was this fellow fell into a strange circumstance. He spent the vast majority of his time working off of vessels. Unfortunately, he didn't have 30 percent on any one particular vessel or fleet of vessels. And the issue was could it be cobbled together. How did Judge Barbier get off track? That's a good question. I think what I was alluding to before was not to suggest that the judge was biased, but that there is just this hostility is not the right word either, but these are unusual circumstances. Oil patch cases versus someone who works on blue water. It's so unusual that we've had hundreds of them. In the Fifth Circuit. But if . . . That's Judge Barbier. That's the kind of work he did. Absolutely, of course. And I hold him in very high esteem. If my client had worked 37.2 percent of his employment on a freighter, I don't think I would be standing here right now. But because he was working from a lift boat, there was some confusion about that. My view is, and I'm humble about my expertise compared to my colleagues here, but I think it's a tail wagging the dog, and I think that's what he perceived to say this is the mission of the vessel. The lift boat is a multipurpose vessel that can do a bunch of different things. And one day it may be doing a plug and abandon, and another day it may be doing something else. But that doesn't mean that every brown water . . . every oil patch guy who goes on that lift boat is necessarily a seaman, does it? I could not agree with you more. And, in fact, I wrote tail wagging dog down on my paper. But that's the situation for the cases in which the defendant cites. This is a completely different situation. Here, the vessel . . . This is a P&A vessel. This vessel only does P&A work. This isn't a situation where it's like a drilling rig jackup where a halibut in hand might fly in, do his job, and then fly back, and this rig is doing a multitude of things. This is a special purpose vessel, as Your Honor pointed out, but it only does P&A work. The whole purpose of this vessel is to do P&A work. That's all it does. And that's . . . We've got dozens of cases where you have a supply vessel that stands by a rig, and it runs errands for the rig. It brings equipment in, hands, roustabouts from the platform come down and help unload the equipment. They pump oil, mud from the boat onto the platform. So if we follow your reasoning, if one of those roustabouts . . . I mean, and the mission of that vessel is to get that well drilled on that rig. That's everybody's mission on the platform and on the vessel. So under your reasoning, all those roustabouts who come down and spend one or two or five percent of their time on that vessel, furthering the mission of that vessel to get that well drilled would be members of the crew of that vessel. No, Judge, I'm not suggesting that at all. They don't have any requirement to spend any particular amount of time aboard the vessel doing the vessel's work. That's not what we're arguing here. What I'm saying is that each case really is fact-specific, and the Seaman's Status Inquiry is fact-specific. In the hypothetical that Your Honor just gave, no, of course not. If they are primarily a platform worker who their activities are on the platform, but occasionally they take a personnel basket and go to the deck of a support vessel, no, that's not our situation. It's the opposite. Wouldn't a supply vessel that Judge Davis is describing, wouldn't the mission of that vessel be transportation? In that hypothetical, it would be transportation and the movement of equipment. But all the people that work aboard that supply vessel in that hypothetical would be seamen. He was referring to workers that are housed and work on the platform that occasionally come to the platform. But not the platform people that would just come on board to offload something. They would not. They would not be seamen. No, you don't walk in and out of Seaman's Status, and I'm not suggesting otherwise. Mr. Alexander was basically the P&A guy who, I mean, his job, and I think I have a deposition here, and he was asked to describe his work. And the work he described that he did, I mean, he described what he did on the vessel too, but when he was asked to give a general description of his work, it was all on the platform. He had to, I mean, that was, he was the lead P&A guy, and his job was to plug and abandon that well that was located on the platform. Now, he did occasional work on the vessel, but like the platform worker in my example, the work is primarily on the platform. No, Your Honor, I have to disagree with you respectfully. Tell me how his work was primarily on the vessel. When he was answering, and I believe I know the part of the deposition that you're referring to, when he was answering the questions of defense counsel, he was speaking in the royal way. He was describing what P&A operations are in general. He wasn't necessarily saying that I, Michael Alexander, do all of these different functions. His function was primarily to work the equipment that was on the vessel. Now, Judge. Where are you going to find that in the evidence? Judge, he's talking about what the whole P&A crew may do, and they have different jobs. He's the lead hand, but that's not to say that he's the top man. That's a confusing term. He had supervisors above him, too. He happened to be on the platform when the wire line broke from the crane of the vessel, which caused his injury, which, again, should be of no moment if he's a seaman because he can't walk in and out of seaman status. But I understand that it creates sort of, again, this bias that I was speaking about before. Well, the guy's on the platform when he gets hurt versus being on the vessel. He happened to be on the platform when he got hurt, but substantial work was done on the vessel. Years ago, didn't Judge Wisdom hold in the Theriault case that a wire line guy was not a seaman? In that particular case. Even though he worked from a vessel all the time? Yes, Your Honor. But first, my client's not a wire line operator. Secondly, although you could say, well, maybe there's an analogy to be drawn there, I think that the Theriault case is more consistent with the example I was giving earlier, when you have a drilling rig and the wire line company will send someone out to the drilling rig to do a job that might last five days, and then they get pulled off of that vessel. So I'm not acquainted with the exact details of the Theriault case, but my guess is that he didn't reach 30% on a particular vessel and he couldn't show that he contributed to the function of that vessel because it may have had more than that one function. This is a P&A boat for all intents and purposes, and that's admitted to by the vessel owner in this case. Didn't you say your client, Mr. Alexander, operated the pump which was on the lift boat? Yes, Your Honor. That was his job? Yes, the cement mixer, blender, and pump, which is essential to the P&A work because they have to put cement down there. But you have no evidence as to what percentage of his time is split between the boat and the platform? Your Honor, I would submit that that's a material issue of fact. The defendant hasn't offered any evidence of that either for us to rebut. And you've got a guy whose job is to plug and abandon the well, and the boat is there to assist. They've got their own crew, and the work that he does is to occasionally go on the boat to pump mud or use the crane. Judge, I have to respectfully disagree. It's not occasional. He does substantial work on the vessel. I mean, there's a litany of things that we have in our brief that he loaded and unloaded the vessel. He cleaned part of the vessel. He helped put down the gangplank. He put down the gangplank on every occasion is his testimony. The evidence you have is that the boat that he, on the jobs he worked on, the boat was alongside for 35% or 37% of the time, not that he worked on the boat 35% or 37% of the time. Our argument is that he worked substantially on the vessel while it was moored alongside or whether it was underway because he also rode the boat from the dock and from well to well. Passenger time ordinarily doesn't count. I mean, we've got cases on that. Your Honor, I don't think he's a passenger if he's performing work while the vessel's underway. So if he's job planning, messing with his tools, cleaning the area, holding safety meetings, the accident report itself, and, again, I'm not trying to make a mountain out of a molehill, but the accident report itself is filled out by the vessel's captain. The report asks what position does he have on the vessel. It says lead hand. It doesn't say passenger. Do you have a red light, Mr. Key? Oh, I am sorry. Thank you very much. Mr. Guillory. May it please the Court. Your Honor, my name is Tim Guillory. I represent Express in this case. I believe that it's important to recognize in this case as other platform worker cases where Siemens Dennis has alleged that the vessel here, the RAM-10, supported the plaintiff's mission and not the other way around. The Jones Act remedy is reserved for sea-based maritime employees whose work regularly exposes them to the special hazards and disadvantages to which they who go down to the sea in ships are subjected. Herb's Welding v. Gray in this circuit established that oil field-related platform work is not maritime in nature. It's essentially a land-based occupation, and I believe that Cardinal Marlin Services holds that such workers are not maritime.  Essentially, they're land-based workers whose work is transposed in a maritime setting, in this case an artificial island, a platform attached to the outer continental shelf. Consistent with this Court's pronouncements is Huffnagel v. Omega Services Industries case, which I believe is controlling in this situation. Like Mr. Alexander, Huffnagel's employer was contracted by an offshore oil field platform owner to provide services to the platform. Huffnagel was repairing pilings. Mr. Alexander was plugging a well. Like Mr. Alexander's situation, the platform owner in Huffnagel also hired a lift boat with its own crew to assist with the work of the platform by providing a floating hotel to workers, as was the situation with Mr. Alexander, and by providing a temporary workstation. I think that the evidence does establish that the lift boat, Ram 10, did allow the plaintiff, Mr. Alexander, to perform some work services aborted, but the focus of his work, as in all of these platform worker cases, was on the platform and on the well. It would make a difference that I think that vessel in Huffnagel, though, didn't supply the cement and the machines that were operating to do the plug and abandon work. Isn't that correct? Well, that argument was not made, but it well could have been. It's my understanding that the Ram 10 was a simple work barge, a lift barge, that had only a crane affixed to it. The assertion that it was a P&A vessel is rather odd to me. I don't see any other suggestion in the evidence of any other equipment that would have it specifically configured to do P&A work. It was a- Those mixers, blenders, are those portable devices? Yes, yes, they are. And the cement is loaded onto the lift boat before it goes out to the site, is that- Presumably, or it could be brought in by a crew boat to the lift boat as it was configured near the plant. Does the record show how much time, relative time, he spent on the boat as opposed to on the platform? Unfortunately, Your Honor, it does not. We do not have that detail of records in this case. There is a question about calculation of whether the boat was alongside the platform 35 or 37 percent of the time, but unfortunately the records do not detail how much of that time the plaintiff was aboard the vessel sleeping, playing Sudoku, or aboard the platform while the vessel was alongside inactive. He did some work on the boat. He did. We'll concede that, Judge. We just don't know how much time that was. In any case, I think the record in this case shows that a lift boat was not essential to Mr. Alexander's work in general as a P&A lead hand. He had other projects, which the records show, which did not utilize a lift boat. In this situation, the lift boat was useful, but again, the focus is that the lift boat was supporting the plaintiff's mission and not the other way around. The plaintiff's mission was to perform essentially a land-based function on an artificial island on the outer continental shelf, to plug an abandoned well, which is essentially and inherently a non-maritime activity. You're relying on Huffnagel. And also Teaver. But didn't Huffnagel sleep on the platform, whereas Mr. Alexander slept on the ramex? I did not see that distinction, Your Honor, in the case. What about the fact that the crane, while opposing counsel said the crane was essential to the plug and abandon work, the crane was on the vessel? The crane indeed was on the vessel. At the time of the accident, the crane boom was situated over the work area. The crane operator was absent. The boom was in a static position, and the wireline operator was running the wireline through a shiv affixed to the crane boom and down the hole. So the wireline operator was aboard the vessel working from there with the wireline unit. So the vessel, the crane, was used and affixed to the- Don't most liftboats have a crane on them? Of course. Of course. That goes to question the assertion that this was a P&A boat, whatever that is. Well, they said you agreed to that. I didn't agree to it, Judge. The vessel owner agreed that the mission of the vessel was to perform the P&A work. Of course- Your client. No, I do not represent the vessel owner. I represent the plaintiff's employer, Express Energy. Well, I mean, just the fact that only 37% of the time there was any kind of vessel involved in the P&A work leads to a pretty good inference that it's not absolutely essential to doing a P&A job. My understanding is if the platform is big enough so that they can move the crane and the other necessary equipment on the platform, then they don't use a boat. They need the liftboat to provide extra space so that it can hold all the equipment. Absolutely, Your Honor. In this particular job, that was the case, but not in all of the plaintiff's work as a P&A hand. He did other jobs which do not require the use of a liftboat. Well, he did the majority of his work, apparently, if he only had the liftboat alongside 37% of the time. Well, unfortunately, there's no way to know exactly how much was aboard. Well, if it was 37% on this boat, we don't know how much it was on other boats, right? Right. There was no common fleet. There was no evidence of the boat usage on other job sites. That's not saying 37.2 or whatever percent of his work was done on the boat as opposed to on the platform. There's no evidence to making that distinction, is there? No, ma'am, there is not. The plaintiff's interpretation of that would mean that the plaintiff never left the liftboat during his entire employment on this job, if you were to believe that the entire 37% was performed aboard the boat. But as Judge Barbier pointed out, the plaintiff had never worked aboard the Ram 10 before this job, and there was no indication that the plaintiff was going to leave with the Ram 10 whenever this job was finished. This job being at Express Energy Services, not the shutdown of this particular well, right? It's the shutdown of this particular well. And also, the plaintiff had never worked with or aboard the Ram 10 at any other Express job site, at any other offshore platforms. Judge Barbier not only relied on Huffnagle, but also on Teaver. And as I had alluded to before, Judge Barbier pointed out that the liftboat, in this case, supported the operations of the plaintiff's employer's work and not the other way around. This Court approved Judge Barbier's analysis in Teaver, which focused on the first prong of Chandra's, basically that the duties of an employee alleging seaman status must contribute to the function of the vessel or to the accomplishment of its mission. And in this case, Judge Barbier found that, according to Teaver, the plaintiff's work did not. The plaintiff worked in a plug and abandoned project in Teaver also and used a liftboat, where Teaver ate, slept, inspected tools that his co-employees would use to disassemble a crane, and discussed work matters. Judge Barbier found that Mr. Alexander failed the first Chandra's prong just as Teaver did and just as Huffnagle did. This Court affirmed Judge Barbier's decision and reasoning in the Teaver decision. Are you familiar with our in-bank decision in Barrett? I'm sorry, Your Honor? Are you familiar with our in-bank decision in Barrett? Yes, sir. I haven't looked at it recently, though. All right, well, just to refresh your memory, in that case there was an offshore welder who did repair work and maintenance work on a platform doing welding work, and he had a jack-up barge, or I suppose it was the same kind of vessel, basically, to provide additional room, and he spent 20 to 30 percent of his time on the adjacent boat and the rest of his time doing welding work on the platform, and we said the purpose of the second prong, connection prong, was to determine whether someone who divides his time between the boat and the platform spends a substantial part of his time on the boat in order to satisfy that prong, and this guy spent 20 to 30 percent of his time on the boat, and we said that was not enough. It had to be 30 percent or more, and it was not enough. So why is that not the same case we have here? Well, we can't say for certainty exactly what the percentage was on the boat, but there are three requirements for Chandris. I'm talking about the substantial connection requirement. The substantial connection is a two-prong, actually. It's two sub-prong requirements. You have to have a substantial connection both in duration, which is the 30 percent rule of thumb, and nature, and this court has looked at the nature of the connection also, what was the focus of the worker's job, essentially. Was it focused on the land-based platform type activity or was it activity that was more focused on the vessel itself and running the vessel? What's interesting about the Roberts v. Cardinal Services case is there this court examined whether it could possibly dip below the 30 percent rule of thumb for a worker who was a plug and abandon helper, and the court reasoned that in this situation it could not. It found that 27.7 percent of this plug and abandon employee's work was aboard the Cardinal vessel, which, by the way, was also owned by that plug and abandon helper's employer. But the court refused to dip below that 30 percent rule of thumb, and it reasoned that the court might well do that in a situation of a diver, which was regularly and substantially subjected to the perils of the sea, and the court drew a distinction between a diver and a plug and abandon worker. The court described the nature of work done by a plug and abandon crew member as someone who practices an art That's the microphone, so you probably don't want to touch it. Thank you. A plug and abandon helper is someone who practices an art developed in land work and transposed to a maritime setting. This court's description of the nature of plug and abandon work is consistent with its holding in Herb's Welding when it reserves the special protections of the Jones Act for those workers described in Seraki, employees whose work regularly exposes them to the special hazards and disadvantages to which they who go down to the sea in ships are subjective. These Jones Act protections and remedies should not be afforded to those workers who are only transiently and fortuitously on a maritime situs and whose work is principally focused on artificial islands in a decidedly non-maritime endeavor. I'd just like to make a few other comments. There was mention of the Wilcox case here, where the district court found an issue of material fact as to whether the plaintiff in Wilcox v. Max Welders presented an issue of fact triable by a jury under the prong one of Chandris. The trial court found in Wilcox that there was a material fact issue which could be presented to a jury because in that case, Wilcox was engaged in vessel repairs, changing out water lines on the vessel, patching up air conditioning on the vessel, helping crew members on and off the vessel, helping with the personnel basket transfers, offloading supplies, cleaning decks, tying vessel ropes, fabricating and welding various appurtenances to the vessel, fastening materials to the vessel for safe transport, and the lift boat contained an 880-ton derrick crane, which was used to lift items off the seafloor for loading onto a materials barge. Nevertheless, what is not cited in the plaintiff's reference to Wilcox was the fact that the trial judge found that Wilcox failed seaman status based on the second prong of Chandris. The district judge reviewed the plaintiff's entire employment context and found no substantial connection to a vessel or fleet. The district judge held that Wilcox's primary duties as a contract welder were to assist the platform fabrication and demolition work. The fact that he was treated as part of the crew of the vessel and performed minor tasks on the vessel during his downtime did not change the fact that his primary job was welding and finning on the platform. This is the situation we have with Mr. Alexander here. In fact, the Wilcox plaintiff, I think, performed more crew-oriented duties with respect to the vessel in that case, and still the judge there found that the plaintiff did not meet the second prong of Chandris. The nature of his work was not a substantial connection to the vessel because its primary focus was platform work, which is, I guess, the bias that plaintiff counsel was referring to when talking about oilfield platform workers who were alleging that they are Jones Act seamen. Finally, the judge reasoned to give teeth to the Chandris's opinion, rejection of the voyage test, as it must be held that merely serving an assignment on a vessel in navigation does not alter a worker's status. A transitory and sporadic work on the RAM-10 did not change the land-based nature of Mr. Alexander's job so as to trigger Jones Act remedies and protections. Okay. Thank you very much. Thank you. Okay. Back to Mr. Key. I'll try to keep an eye on the light this time. I apologize before. Just to clarify a few things, the time that is calculated to make 37.2 does not include the hours that he slept. If you included the hours that he slept, it would be over 50 percent, but we're not making that argument. These are the hours that he worked that are being calculated, and I just wanted to clarify that. He did eat and sleep on the vessel, and I understand that standing alone is not essentially an important factor, but I think when you look at the totality of the employment, the loading and the unloading, the cleaning, the work that he did on the vessel itself, living on the vessel, planning the jobs, doing the safety work, you can't just devalue that simply because he may also have worked a portion of his time. And we think not a significant portion, but some portion of his time while the vessel was alongside on the platform. The way I read this chart, which I think is the evidence that supports the 37.5 percent. Yes, Your Honor. It says the information summarized below gives the employee hours, which shows the days the plaintiff used the Aries Marine lift boats as quarters offshore. So I read that as giving the days when he was doing P&A work when this Aries Marine provided the lift boat. Well, Your Honor, I disagree with the characterization that he was just lodged on the vessel. I don't know. Yeah, but what you were saying is it didn't count sleep time. Right. No, it didn't count sleep time. Why doesn't this chart also count sleep time? Well, it should. For instance, Your Honor, if you look at page 2 of tab 8, June 22, 2011, that's the first day that he worked aboard the Aries 10. He didn't go back to the dock and sleep for five hours and then get back on the next day. I'm not trying to be flip. He didn't get back the next day and work another 12 hours. In other words, he was continuously out there. This is the time they got charged for, and so they don't count his sleep time. So he worked 19 hours on the 22nd. That's what wasn't included, and that's what makes it 37.2. How many of those hours were on the platform as opposed to the boat? Your Honor, there's no evidence provided by the defendant as to that. My client has testified that his equipment was on the vessel, and he did significant work on the vessel. And had the burden of proof. Well, in terms of a summary judgment, I think the evidence is supposed to be viewed in a light most favorable to the plaintiff. He certainly provided evidence that shows that he did substantial work on the vessel with the vessel. When they challenge your allegation that he was a member of the crew, then you've got to come forward with evidence showing that he spent at least 30% of his time working on the boat. And, Your Honor, I believe we've brought forth evidence that showed he worked 37.2% of the time. He did not, counsel for the defendant did not provide any evidence saying that he didn't. And if we could just, while we're looking at the. . . The problem is that that component, that 37.2, doesn't distinguish between work on the vessel and work on the platform. Well, the Fifth Circuit. . . There's an allegation that some of the work was on the platform. Some of the work may have been, but we. . . We know most of it was, don't we? No, Your Honor. No, most of it was on the vessel. You plug in. . . I know that you're a tough sell on that point, but that's what the evidence shows. And they have no evidence to rebut that. They can offer no evidence. His only response is, I don't know. Do you have anything other than this chart that would show where he worked? Other than his deposition testimony and affidavit that says what he did on the vessel, which was substantial. But, again, just to clarify a few things, most of this fellow's work was done from a P&A vessel. It just wasn't an Ares vessel. He did 37.2 percent from Ares. He's not a land-based worker. He did all of his work in the Gulf. Occasionally, you might see one week where he's in the shop doing something because the vessel was unavailable. Well, when the platform is big enough, I understand they do it all from a platform. Is that not right? That's not right. Again, this is fact specific. . . Deepwater Horizon? Your Honor, it's fact specific. If the platform is big enough and the job requires it, it might be a totally different situation. The work he was doing was always with a P&A boat. The platforms were small. They were hired by Apache to plug in a bend in this entire field. That's why he had been out there for months working off of this single vessel. At different well sites. Excuse me? At different well sites. At different well sites. So he would take it from the dock to the well and then from that well to the next well to the next well? They were all too small. They never had their own crane. This is a side issue. Was he covered by state workers' comp or the Longshore Act? Longshore. But that's a point of contention. And as the Naquin's case says, the fact that there's overlap is not really relevant. Okay. Thank you, Counsel. Thank you. You have your case. And that completes the docket for the day.